IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF:<br><br>HERITAGE HIGHGATE, INC.,<br><br>        Debtor.<br>────────────────────<br><br>JOHN YAISSLE and CORNERSTONE INVESTORS, et al.,<br><br>        Appellants,<br><br>    v.<br><br>UNSECURED CREDITORS COMMITTEE,<br><br>        Appellee. | HON. JEROME B. SIMANDLE<br><br>CIVIL NO. 10-2837 (JBS)<br><br><br>ON APPEAL FROM AN ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY<br><br>[Case No. 09-11198/GMB]<br><br><br>**OPINION** |

APPEARANCES:

Joseph S. D'Amico, Jr., Esquire
Douglas J. Smillie, Esquire
FITZPATRICK LENTZ & BUBBA, P.C.
4001 Schoolhouse Lane
P.O. Box 219
Center Valley, PA 18034
    Attorney for Appellants

Joshua T. Klein, Esquire
Michael J. Viscount, Jr., Esquire
FOX, ROTHSCHILD LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103
    Attorney for Appellee


**SIMANDLE**, District Judge:


## I.   INTRODUCTION

    This matter is before the Court on the appeal of John Yassile and the Cornerstone Investors (the "Cornerstone Investors" or "Appellants") of the May 6, 2010 Order of the

Bankruptcy Court for the District of New Jersey, which granted the motion of the Official Committee of Unsecured Creditors ("Committee" or "Appellee") to determine the value of the Cornerstone Investors' secured claims at zero, pursuant to 11 U.S.C. § 506(a) and Rule 3012 of the Federal Rules of Bankruptcy Procedure. Because the Court finds that the Bankruptcy Court appropriately interpreted § 506(a) in valuing the Appellants' claims and followed appropriate procedure under the Federal Rules of Bankruptcy Procedure, the Court will affirm the Bankruptcy Court's order.

## II. BACKGROUND AND PROCEDURAL HISTORY

This issue is rooted in the voluntary Chapter 11 petitions for bankruptcy filed by the Debtors in this case.[1] On January 20, 2009, Debtors Heritage Highgate, Inc. and Heritage-Twin Ponds, II, L.P. both filed separate Chapter 11 petitions with the Bankruptcy Court for the District of New Jersey. (Stipulation ¶ 1.) (See Bankruptcy Dockets 09-11197 and 09-11198.) Debtors own and develop a residential subdivision in Lehigh County, Pennsylvania, encompassing approximately 140 acres, known as the "Highgate." (Stipulation ¶ 2.) The Debtors anticipated

---

[1] The facts and procedural history listed in this Opinion were taken from the parties' Joint Stipulation of Facts ("Stipulation") submitted to the Bankruptcy Court [Bankruptcy Docket Item 377] and by reference to the Bankruptcy Docket.

developing 411 individual residential units in the Highgate.
(Id.)  The Debtors entered into construction loan agreements with
a group of Bank Lenders, who hold a first priority lien on
substantially all of the Debtors' assets, which the parties to
this appeal refer to as the "Senior Secured Debt."  (Id. ¶ 8.)
As of the date of the Joint Stipulation of Facts, the Senior
Secured Claim amounted to $12,074,333.  (Id. ¶ 10.)

Prior to petitioning for Chapter 11 bankruptcy, the Debtors
had entered into various loan agreements with the Appellants, a
group of individuals and trusts known as the "Cornerstone
Investors."  (Id. ¶ 11.)  These loans were secured by liens of
equal priority on substantially all of the Debtors' assets.
(Id.)  As of the date of the Joint Stipulation of Facts, the
Appellants were owed approximately $1.4 million.  (Id.)  During
the course of the bankruptcy proceedings, the Cornerstone
Investors entered into agreements with the Bank Lenders, which
provide that the Cornerstone Investor claims are subordinated to
the Bank Lenders' Senior Secured Claim.  (Id.)

After developing and selling off 101 units of the 411 unit
subdivision, on January 20, 2009, Debtors filed their petitions
for bankruptcy.  On June 9, 2009, the Debtors filed a joint
proposed plan of reorganization in which the Debtors would emerge
from Chapter 11, continue and complete the project, and make
distributions to creditors according to a set of projections.

3

(Id. ¶ 2.) [Bankruptcy Docket Items 133 & 134.]  In the first proposed plan, Debtors projected that they would pay the secured claims of the Cornerstone Investors in full after paying the Bank Lenders in full, and thereafter pay all unsecured allowed claims at a rate of approximately 20% of each claim upon completion of the project.  (Disclosure Statement, June 9, 2009 at 18-20.)

On September 4, 2009, the Official Committee of Unsecured Creditors, Appellee in this matter, filed its Motion to Determine the Value of the Secured Claims of Cornerstone Investors Pursuant to 11 U.S.C. § 506(a) and Rule 3012, Fed. R. Bankr. P. [Bankruptcy Docket Item 190.]  The Committee argued in its brief that the Bankruptcy Court should value the secured claims of the Cornerstone Investors at zero because, based on an appraisal of the Highgate Project, the entire Project, the collateral securing the Cornerstone Investors' liens, was worth less than the Senior Secured Claims, leaving no collateral to secure the Cornerstone Investor claims.  (Mot. to Determine Value ¶ 19.)

On September 22, 2009, the Cornerstone Investors responded in opposition to the Committee's motion. [Bankruptcy Docket Item 211.]  In their response, the Cornerstone Investors argued that their claims should be valued as fully secured because the Debtors' proposed plan included a budget which projected sufficient plan revenue to be able to pay the Cornerstone Investors' claims in full.  (Br. in Opp. ¶ 11.)  Additionally,

4

the Cornerstone Investors argued that "the Committee's Motion is premature and should be deferred pending a determination as to whether the Plan will be confirmed."  (Id. at ¶ 31.)

In the following months, the Debtors' Chapter 11 Plan was amended multiple times.  On October 19, 2009, the Debtors submitted the Second Amended Disclosure Statement [Bankruptcy Docket Item 253], which was approved by the Bankruptcy Court on October 22, 2009 [Bankruptcy Docket Item 263].  The approved Disclosure Statement estimated that the unsecured creditors would receive approximately 33% of their claims upon completion of the project. (Second Am. Disclosure Statement at 27.)  The parties to this appeal have subsequently stipulated that the final confirmed plan proposes to pay "general unsecured creditors a distribution in the approximate amount of forty-five percent (45%) of all outstanding prepetition general unsecured claims." (Stipulation ¶ 5(c).)

On March 2, 2010, the Debtors submitted the First Modified Second Amended Joint Plan of Reorganization ("Confirmed Plan"). [Bankruptcy Docket Item 348.]  This final plan specifies that the secured claims of the Cornerstone Investors (classified as Class 3 under the Plan) will be treated as secured only to the extent determined by the Bankruptcy Court according to 11 U.S.C. § 506(a).

> The amount of the Secured Claims of the Cornerstone Investors shall be determined by

5

> the Bankruptcy Court under Section 506(a) of
> the Bankruptcy Code, which has been presented
> to the Bankruptcy Court by the Committee's
> Motion to Determine the Value of the Secured
> Claims of Cornerstone Investors . . . Each
> holder of a Class 3 Claim shall be paid under
> this Section 4.3 to the extent of the
> determination of its secured status by the
> Bankruptcy Court in connection with the 506(a)
> Proceeding, and to the extent any portion of
> the Claim is an unsecured Deficiency Claim
> under section 506(a) of the Bankruptcy Code,
> such portion shall be treated as a Class 5
> Claim under this Plan."

(Confirmed Plan at 15-16).  The Plan otherwise classified all allowed unsecured claims as Class 5 claims.

The Plan contains a budget, which anticipates full payment of the Bank Lenders' senior secured debt by January of 2013, and commencing payment to a line item titled the "subordinated equity loan" in January of 2013 and to complete payment of $1.4 million by June of 2013.  (Confirmed Plan, Ex. A at 7.)

On April 1, 2010, the Bankruptcy Court entered its Order confirming the Plan.  [Bankruptcy Docket Item 373.]  In the Order, the Bankruptcy Court found, as required under 11 U.S.C. § 1129(a)(11) that the Plan is "feasible," meaning that, upon confirmation, the Court did not anticipate further liquidation or reorganization of the Debtors, beyond what was anticipated in the Plan.  (Conf. Order ¶ 28.)

On April 14, 2010, the parties to this appeal filed their Joint Stipulation of Facts.  [Bankruptcy Docket Item 377.]  In that document, the parties stipulate that the Bank Lenders, as

holders of the Senior Secured Claim, are owed $12,074,333. (Stipulation ¶ 10.)  The parties also stipulated that an appraisal was conducted in connection with a separate contested issue during the bankruptcy proceedings which purported to establish the total fair market value of the project.  (Id. ¶¶ 16-17.)  Finally, the parties stipulated that, accounting for the sale of an additional 63 lots in the project since the date of the Appraisal, the appraised value of the project had declined before confirmation.  (See Stipulation Ex. F.)  "Based on the Appraisal, the total fair market value of the Project as of the Confirmation Date is $9,543,396.23."  (Stipulation ¶ 20.)

On May 3, 2010, the Bankruptcy Court held argument on the Committee's motion to value the Cornerstone secured claims pursuant to § 506(a).  In the hearing, the Bankruptcy Court determined that the proper method of valuing the Cornerstone Investors' collateral was the fair market value of the Project as established in the Appraisal rather than based on the revenue projections contained in the Plan Budget.  (Appellants' Br. Ex. A at 19:14-18.)  On May 6, 2010, the Bankruptcy Court entered its Order granting the Committee's motion, finding that "the value of the secured portion of the Cornerstone Investor Claims is $0.00, and, as a result, the Cornerstone Investor Claims are hereby determined to be wholly unsecured claims under the Bankruptcy Code." [Bankruptcy Docket Item 396.]

The Cornerstone Investors subsequently appealed that Order to this Court.

## III. DISCUSSION

### A.  Standard of Review

This Court has jurisdiction to review the Order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).  District courts must review bankruptcy courts' findings of fact for clear error, their conclusions of law de novo, and their exercises of discretion for abuse of discretion.  See In re Top Grade Sausage, Inc., 227 F.3d 123, 125 (3d Cir. 2000) (citing In re Engel, 124 F.3d 567, 571 (3d Cir. 1997)).  In reviewing factual findings, the district court must "give due regard to the opportunity of [the bankruptcy] court to judge, first-hand, the credibility of the witnesses."  In re Rosen, 208 B.R. 345, 348 (D.N.J. 1997) (quoting Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1223 (3d Cir. 1995)).  For mixed questions of law and fact, the district court "must accept the [the bankruptcy] court's findings of historical or narrative facts unless they are clearly erroneous, but must exercise a plenary review of the court's choice and interpretation of legal precepts and its application of those precepts to the historical facts."  In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3d Cir. 1989) (quoting Universal Minerals, Inc. v. C.A. Hughes & Co., 669

F.2d 98, 102-03 (3d Cir. 1981)).

In the instant case, the Bankruptcy Court has made a determination about the best method of valuing the Cornerstone Investors' claims, which the Court treats as a conclusion of law, and found that under that particular valuation method, the value of the Cornerstone Investors' secured claim is $0.00, which the Court treats as a finding of fact. See Associates Commercial Corp. v. Rash, 520 U.S. 953, 965 n.6 (1997).

### B. Valuing a Claim Under 11 U.S.C. § 506(a)

The Bankruptcy Code provides a mechanism for interested parties to request that the court value a claim that has been properly secured by collateral to determine whether and to what extent the claim should be deemed secured.  The relevant section of the Code reads:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.  Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).  The Supreme Court has interpreted the

first sentence of this section to direct the court to divide a
secured creditor's claim "into secured and unsecured portions,
with the secured portion of the claim limited to the value of the
collateral." Associates Commercial Corp. v. Rash, 520 U.S. 953,
961 (1997). In the instant case, therefore, the claims of the
Cornerstone Investors, which are secured by valid liens on the
property of the Project, are secured claims within the meaning of
§ 506(a)(1) only to the extent that the value of the Cornerstone
Investors' interest in the Project has a positive value after
accounting for payment of the Senior Secured Claim. Because the
parties have stipulated that the Senior Secured Claim amounts to
$12,074,333, the claims of the Cornerstone Investors will be
deemed secured under § 506(a) only to the extent that the Project
is valued at an amount greater than that. Should the valuing
court determine that the Project, at the time of the confirmation
of the Plan, was worth less than $12 million, then § 506(a)(1)
dictates that the Cornerstone Investors' claims should be treated
as wholly unsecured. See In re McDonald, 205 F.3d 606, 611 (3d
Cir. 2000) (reasoning that under § 506(a), when a junior
lienholder's collateral is valued at less than the amount due to
the senior lienholder, the junior lienholder "does not have a
secured claim.")

Further, the Supreme Court interpreted the second sentence
of § 506(a)(1) to direct the valuing court's determination of how

10

to value the collateral.  <u>Rash</u>, 520 U.S. at 961-62.  The Court emphasized the importance of the words "proposed disposition or use of such property" for directing the court's choice of valuation method.  <u>Id.</u> at 962.  In <u>Rash</u>, the Chapter 13 debtor proposed to keep, rather than sell, the truck that the creditor had secured by a lien.  <u>Id.</u> at 956.  The debtor then proposed to value the creditor's interest in the truck, under § 506(a), as limited to the liquidation value of the truck (which was a lower valuation) rather than its replacement value (which was a higher valuation).  <u>Id.</u> at 957.  The Court determined that, guided by the "proposed disposition or use" of the truck, the replacement value was more salient.  <u>Id.</u> at 962.  The Court held that, in a case where the bankruptcy plan called for the debtor to maintain possession and use of the asset in question, "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller."  <u>Id.</u> at 960.  Thus, in the instant case, because the confirmed Plan does not call for the Debtors to liquidate the Project immediately, but instead to complete development of the Project and sell off the remaining residences over time, the Court should determine the value of the Project in that light rather than under a liquidation or foreclosure basis.

**C.   Appellants' Arguments**

Appellants argue that the Bankruptcy Court erred by using the Appraisal to value their claims rather than using the Plan Budget.  This Appeal thus requires the Court to determine whether the Plan Budget -- which projects sufficient revenue generated from the sale of the remaining units to pay the Cornerstone Investors' junior liens in full, and which was confirmed as "feasible" by the Bankruptcy Court, but which is attached to a Plan that explicitly reserves the question of the valuation of the Cornerstone Investors' claims -- should serve as the valuation pursuant to § 506(a)(1).  Because the Court agrees with the Bankruptcy Court's ruling that the Plan Budget does not control in this circumstance, it will affirm.

    1.   Valuation Based on the Proposed Disposition or Use

The Appellants' first argument is that the Bankruptcy Court erred by using the Appraisal as the basis for its valuation rather than relying on the Plan Budget, because the Plan Budget more closely conforms to the Supreme Court's instruction in Rash to conduct a valuation in light of the asset's proposed distribution or use and that the Appraisal is not a valuation based on the highest and best use of the secured collateral. Appellants cite to Rash and other Bankruptcy Court cases for the proposition that, when the collateral is intended to be retained by the debtor, a liquidation or surrender value is inappropriate

for a § 506(a) valuation.  Thus, Appellants argue, the Plan
Budget, which anticipates the Debtors' projected revenues and
schedules of payments to creditors, is a closer approximation for
the proposed use of the Project than the valuation based on the
Appraisal, which Appellants describe, interchangeably, a "a
liquidation value" (Appellants' Br. at 14), "a simple 'market
value'", and "'replacement value'" (Id. at 16).

The Appellants' argument fails, however, when applying these
precepts to the facts of this case.  The Court finds that the
Appraisal does not value the Highgate Project at a liquidation
value, but instead comports with the Supreme Court's direction in
Rash to value an asset according to its disposition or use; to
value an asset that will be retained according to the "price a
willing buyer in the debtor's trade, business, or situation would
pay to obtain like property from a willing seller."  Rash at 960.

First, the Court finds that the Appraisal values the
Project, anticipating that it will be retained and completed by
the Debtors, according to what such a buyer would pay to obtain
such a property.  In the Appraisal's "Valuation Analysis"
section, the appraiser describes the approach used to come up
with its appraisal value, which includes a complex consideration
of both an "Income Capitalization" and a "Sales Comparison"
approach, in an effort to evaluate an appropriate price for the
unique, non-fungible real estate project.  (See Stipulation Ex. E

13

at 57.)  The appraiser defined the "Income Capitalization" method as accounting for "net sales proceeds" of selling the remaining units as well as "for the costs, time delay and risk associated with selling out the improved and unimproved lots over time." (Id.)  The appraiser also factored in a "Sales Comparison" approach to valuation of the Project, described as "a set of procedures in which an appraiser derives an indication of value by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments, based on the elements of comparison, to the sale prices of the comparable sales."  (Id. at 64.)  The appraiser then calculated a final valuation of the Highgate Project based on his consideration of both methods.  The Court finds that this method of valuation more closely approximates the "replacement value" approved by the Rash Court rather than the liquidation value it rejected.

By contrast, to the extent that the Plan Budget can be considered a valuation of the Project at all[2], the Court finds that it is an inappropriate one for the case at hand.  First,

_____

[2] The Court notes that the Plan Budget as confirmed by the Bankruptcy Court does not specify a total valuation of the Project, but merely outlines a series of principal and interest payments to creditors titled "Wachovia" and "Subordinated Equity Loan" that total more than $15 million.  (See Order Confirming Plan at 19, Column titled "Project Total", Rows labeled "Interest Expense - Wachovia", "Principal Payment - Wachovia", "Subordinated Equity Loan - Interest", and "Subordinated Equity Loan - Principal".)

unlike the valuation proposed by the Appellee and credited by the Bankruptcy Court, the Plan Budget is not discounted to present value to account for risk or uncertainty, but is merely an optimistic estimate of potential revenues from completion of the Project.[3]  Second, the Plan Budget's projections are valued at the future date of payment rather than as of the date of Confirmation, which the Bankruptcy Court determined was the appropriate time for valuation, and which the Appellants have not contested.[4]

The Appellants' reliance on <u>Rash</u> and <u>In re UAL Corp.</u>, 351 B.R. 916 (Bankr. N.D. Ill. 2006) is unavailing on this issue. The <u>Rash</u> Court did not require or contemplate a more favorable valuation than the one provided by the Appellee based on the Appraisal here, but merely required that the valuation be conducted in light of the asset's proposed distribution or use. <u>Rash</u> at 962.  The <u>UAL</u> court concluded that, in a case where the

---

[3] The issue of the feasibility finding of the Plan Budget by the Bankruptcy Court will be addressed <u>infra</u>.

[4] The Court agrees with the Bankruptcy Court that the appropriate time of valuation in this case was the date of Plan Confirmation.  <u>See</u> <u>In re Melgar Enterprises, Inc.</u>, 151 B.R. 34, 42 (Bankr. E.D.N.Y. 1993) (finding that project should be valued in its present state as of confirmation date, rather than based on future anticipated development); King, <u>4 Collier on Bankruptcy</u> ¶ 506.03[10] (15th ed. Rev. 2009) (discussing the potential relevant dates of valuation for the purposes of § 506(a), all ranging in time from the date of petition to the date of confirmation; none considering establishing a valuation as of some future date).

asset being valued under § 506(a) was a non-fungible real-estate property like the instant case, the court should determine value based on consideration of comparable sales figures.  "When collateral is not fungible, there is no readily accessible market price, and the value of 'like property' can only be measured by comparison to transactions involving similar properties, with adjustments for whatever relevant differences exist between the collateral and its comparables."  UAL at 920.

The Court concludes that the valuation method which best anticipates the Project's "proposed disposition or use", and therefore complies with the requirements of Rash and § 506(a), is the valuation proposed by the Appellee, based on the Appraisal, and accepted by the Bankruptcy Court.

> 2.   Valuation of the Project in Light of the Confirmation of the Plan Budget

The Appellants argue that when the Bankruptcy Court confirmed the Plan and Plan Budget, which projects future sales sufficient to pay the Cornerstone Investors' claims in full, it necessarily found that the Project had sufficient value to classify their claims as secured under § 506(a).  The Bankruptcy Court, in oral argument on the instant issue, dismissed this argument by concluding that, first, the Plan did not make any finding of the valuation of the Project, because it explicitly reserves determination of the valuation of the Cornerstone Investors' claims and, second, that Confirmation of the Plan and

16

Plan Budget did not entail a finding that the Budget projections
would necessarily be met.  (Appellants' Br. Ex. A at 14:3-14.)
The Court affirms the determination of the Bankruptcy Court that
the confirmation of the Plan and Plan Budget did not establish
the Plan Budget as the valuation of the Plan.

First, the Court notes that it interprets the Plan to
explicitly avoid making any statement about a present valuation
of the Project.  In the confirmed Plan, under the section
discussing the treatment of the claims of the Cornerstone
Investors, the Plan states that "[t]he amount of the Secured
Claims of the Cornerstone Investors shall be determined by the
Bankruptcy Court" at the later date that the present motion is
decided.  The Plan goes on to state that the Cornerstone
Investors' claims will be paid under Class 3 only to the extent
that they are deemed secured under § 506(a).  (Confirmed Plan at
15-16.)  Appellants' argument that when it confirmed the Plan
Budget, the Bankruptcy Court necessarily valued the Project
according to the Plan Budget would require the Court to ignore
this portion of the Plan.

Second, the Court concludes that confirmation under 11
U.S.C. § 1129(a) does not automatically transform an attached
Plan Budget into a valuation of the debtor's assets.  The
Bankruptcy Court stated that the purpose of the Plan Budget was
merely to meet the feasibility requirements of § 1129(a)(11).

17

(Appellants' Br. Ex. A at 13:6-24.)  As the Second Circuit has
held, "the feasibility standard is whether the plan offers a
reasonable assurance of success.  Success need not be
guaranteed." Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d
Cir. 1988).  See also In re TCI 2 Holdings, LLC, 428 B.R. 117,
148 (Bankr. D.N.J. 2010) ("The key element of feasibility is
whether there is a reasonable probability the provisions of the
Plan can be performed. . . ultimately, the plan must be doable.
That is not to say that the proponents must guarantee their
financial future.  It simply means that the mere potential for
failure of the plan is insufficient to disprove feasibility.")
(internal citations and quotation marks omitted).  Consequently,
finding that the Plan was feasible does not entail valuing the
Project in accordance with the projections contained in the Plan
Budget.  The projections in the Budget were submitted merely to
demonstrate to the Bankruptcy Court that, should it later find
the Cornerstone Investors' claims to be fully secured, the Plan
would still have a "reasonable probability" of success.  The
Court concludes that, while the Budget demonstrates that there is
the possibility that the Plan might yield sufficient revenue to
pay the Cornerstone Investors' claims in full, that is not the
same thing as finding that the Project's present value (at the
time of the Plan confirmation) was greater than the Senior
Secured Claim of the Bank Lenders.

18

    3.   <u>Lien Stripping in Chapter 11 cases under Dewsnup</u>

Appellants argue that the Bankruptcy Court's determination that their claims are wholly unsecured runs counter to the holding of the Supreme Court case of <u>Dewsnup v. Timm</u>, 502 U.S. 410 (1992).  In <u>Dewsnup</u>, the Court held that a Chapter 7 debtor could not use § 506(d) to strip down a secured lien to the present value.  <u>Dewsnup</u>, 502 U.S. at 417 ("we hold that § 506(d) does not allow petitioner to 'strip down' respondents' lien, because respondents' claim is secured by a lien and has been fully allowed pursuant to § 502").  Appellants quote language that they believe should also apply to the present case: "Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain."  <u>Id.</u> Appellants argue that, consistent with this principle, the Unsecured Creditors here ought not to be able to secure a "windfall" by using § 506(a) to determine that the Cornerstone Investors' claims are unsecured.

The Court affirms the Bankruptcy Court's rejection of this argument.  The Court agrees with the Bankruptcy Court that <u>Dewsnup</u> was limited to a Chapter 7 bankruptcy, where the debtor was liquidating the assets, and should not be applied to a

19

Chapter 11 case where the Debtors retain and continue to develop the assets. See, Dewsnup, 502 U.S. at 416-17 ("we therefore focus upon the case before us and allow other facts to await their legal resolution on another day.")  See also King, 4 Collier on Bankruptcy ¶ 506.06(1)(c) (15th ed. Rev. 2009) ("The great majority of post-Dewsnup decisions on the issue of 'lien stripping' have limited the Dewsnup holding to the chapter 7 context").  Indeed, Appellants' argument would seem to be implicitly contradicted by the Third Circuit's holding in McDonald that a lien secured by a mortgage to collateral that is completely absorbed by a senior lien is wholly unsecured under § 506(a).  205 F.3d at 611.  Consequently, the Court concludes that Dewsnup does not prohibit the Bankruptcy Court's determination under § 506(a) that the Cornerstone Investors' claims are wholly unsecured.

      4.  Criticism of the Appraisal as a Valuation Method

Appellants argue that the Bankruptcy Court's reliance on the Appraisal was in error because of various imperfections in the Appraisal for the purpose of the valuation motion.  Appellants argue that, because the Appraisal was conducted in 2009, and valued the Project as of February 21, 2009, that its assumptions and estimations of the value of the Project had gone out of date as of April of 2010, when the Plan was confirmed.  The Court notes that, in an effort to bring the Appraisal up to date, the

Committee adjusted the Project valuation downward to account for additional sales of homes. (See Stipulation Ex. F.) This adjustment, Appellants argue, does not account for any potential changes in land value or the residential home market that could have occurred between February 2009 and April 2010. The Court agrees with Appellants that the market could have changed in that time, but notes that Appellants did not provide the Bankruptcy Court (or this Court on appeal) with any data that would allow the Court to modify its valuation. There is no evidence in the record to suggest that the value of the land or the residential home market increased from 2009 to 2010.

Appellants also argue that the fact that the Appraisal was conducted for the purpose of a cash collateral hearing in the summer of 2009 invalidates it for the purpose of valuing the Project in the instant valuation motion. Courts have recognized that, pursuant to § 506(a), the purpose for which a valuation was conducted is relevant to selecting a particular valuation. See In re Midway Partners, 995 F.2d 490, 494 (4th Cir. 1993) (holding that 506(a) valuation should be conducted 'in light of the purpose of the valuation') (quoting § 506(a)(1)). Again, however, the Appellants have provided the Court with no evidence indicating how the original purpose of the Appraisal would render its valuation inappropriate for the present purpose. Consequently, the Court must reject Appellants argument on this

point as well.[5]

## 5.  Procedural Arguments

Finally, Appellants argue that § 506(a) was an inappropriate procedure for determining that the Appellants' claims were wholly unsecured.  Appellants characterize the effect of being declared wholly unsecured as: (1) stripping off of their liens, (2) voiding their liens, and (3) disallowing their liens. (Appellants' Br. at 22).  Thus, they argue, the proper procedure would have been an adversary proceeding rather than a motion. The Court rejects this argument, as it improperly characterizes the Bankruptcy Court's Order and its effect.  The Committee has not challenged the validity or moved to avoid the Cornerstone Investors' liens; they have merely moved to have them declared as wholly unsecured, but fully allowed, which the Bankruptcy Court has done.  The Court concludes that moving pursuant to § 506(a) and Rule 3012 of the Federal Rules of Bankruptcy Procedure, as

---

[5] Appellants also argue, confusingly, that the Committee's proposed valuation was invalid because it "ignores a $2 million increase in value "as of January 1, 2010" contained within the Appraisal." (Appellants Br. at 27) (emphasis original). Appellees do not respond to this argument, and Appellants do not raise it in their reply brief.  Appellants point to a hypothetical condition that the appraiser considered in conducting his appraisal, in which he determined that if the Debtors invested approximately $2 million in improving the infrastructure of one section of the Project, the value of that section would increase by approximately $2 million, resulting in a net valuation increase of approximately $0.00.  (Stipulation Ex. E at 89-90.)  The Court therefore concludes that this potential increase in price has no net effect on the valuation of the Project.

the Appellee here did, is the proper procedure for this action.

## IV.  CONCLUSION

The Court concludes that a valuation under 11 U.S.C. § 506(a)(1) must take into account the anticipated use of the asset being valued, but must also be valued according to the asset's current condition and at a particular time.  The Court further concludes that a plan budget, attached to a plan that explicitly reserves the question of valuation of the debtor's assets, does not automatically become a binding valuation of those assets upon confirmation by a bankruptcy court.  Because the Court has concluded that, in this case, the Bankruptcy Court properly considered the Project's disposition and use, the purpose of the valuation, and properly followed the Federal Rules of Bankruptcy Procedure, the Court will affirm the Bankruptcy Court's Order of May 6, 2010, determining the Cornerstone Investors' claims to be wholly unsecured.  The accompanying Order will be entered.


**March 16, 2011**                              **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                United States District Judge